842 P.2d 1322

**The GROWERS COMPANY, Petitioner Employer,**

**Paula Insurance Company, Petitioner Carrier,**

v.

**INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Jesus Fimbres, Respondent Employee.**

**Growers Transplanting, Inc., Respondent Employer,**

**Pacific States Casualty, Respondent Carrier.**

No. 2 CA–IC 91–0055.

Court of Appeals of Arizona, Division 2, Department B.

June 16, 1992.

Review Denied Jan. 12, 1993.

---

310

Spencer K. Johnston, Phoenix, for petitioners.

The Industrial Com'n of Arizona by Anita R. Valainis, Chief Counsel, Phoenix, for respondent.

Tretschok, McNamara & Clymer, P.C. by Patrick R. McNamara, Tucson, for respondent employee.

R. Todd Lundmark, Phoenix, for respondents employer and carrier.

## OPINION

FERNANDEZ, Presiding Judge.

Petitioner The Growers Company (GC) contends that the administrative law judge (ALJ) erroneously found that the claimant, Jesus Fimbres, was an employee of GC, arguing that the ALJ should have determined instead that respondent Growers Transplanting, Inc. (GTI) was Fimbres's special employer, dual employer, or statutory employer. We disagree and affirm the award.

Fimbres testified that he began working for GC in 1988 and continued when work was available through the date of his accident in September 1990. He worked as a tractor driver, truck driver, and laborer. GC is a custom harvester/labor contractor, which provides crews of workers for planting and harvesting crops. It charges its customers the costs of its crews and other expenses plus a 35 percent profit. GC hires a large number of laborers, having issued over 8,000 W–2 forms in 1990, and it carries workers' compensation insurance for its employees.

Shortly before the injury, GTI contracted with GC to perform a cauliflower transplanting job for a farm near Yuma. GTI is a company in Salinas, California, which grows vegetables in greenhouses and then transplants the seedlings to farms through the use of highly sophisticated machines. GTI's director of transplanting testified that GTI contracts with companies such as GC to provide the generally unskilled laborers who assist in the transplanting. GTI employees operate the planting machines and make certain that the seedlings are transplanted correctly.

GC initially furnished a foreman to supervise its workers for the cauliflower transplanting job. The foreman kept payroll records listing the names and social security numbers of the workers in the field. He also made certain the workers had water and portable bathroom facilities available. A few days after the job began, GTI's director of transplanting told the GC supervisor that the job was not large enough to require a foreman and the GTI machine operators could supervise the labor crews. The foreman then left the site. A GC supervisor testified that he continued his duty of determining each day that there were eight laborers available to work for each transplanting machine, but otherwise he had nothing to do with the job. The GTI director of transplanting testified that the machine operators would report to him if they had difficulty with any of the laborers, and he would discuss the problem with the GC supervisor.

After the foreman left the job, Fimbres began fulfilling his job responsibilities. Fimbres testified that he took water to the fields and hauled a trailer carrying portable toilets that was parked by the fields where the crews were working. In addition, Fimbres testified that he filled out payroll records each night after the workers left the field. He filled out a crew time summary form that listed the date, place worked, type of work done, hours worked, and number of workers used. Fimbres then took that form to a GTI machine operator who signed it. Fimbres subsequently filled out a daily time record sheet that listed the names and social security numbers of the workers and the hours worked by each person that day. Both forms were submitted to GC's office where they were used to compute each worker's paycheck and to bill the customers for the labor crews.

A GTI machine operator testified that he kept his own daily records of the workers, which he submitted to his supervisor for comparison with the bill submitted by GC. GTI's director of transplanting testified that it was unusual to have its machine operators sign a labor contractor's time sheet forms but that when the contract was negotiated, GC had requested that they sign the forms and GTI had agreed. Both the transplanting director and the machine operator testified that it was of no importance to GTI whether or not they signed GC's forms.

Fimbres testified that shortly after the foreman left the job, he spoke to a GC supervisor and the president of GC about being paid extra for handling the payroll, water, and toilets. He stated that both

men asked him to perform the tasks and that the president promised him he would be paid for it. The president testified that he told Fimbres he would ask GTI if it would authorize paying him for doing the work and that he would pay it if GTI agreed. Both the president and GC's supervisor denied asking Fimbres to perform the work and denied that he ever performed a foreman's duties. GTI's director of transplanting testified that he had no discussion with GC about its payroll records after GC's foreman left the job. He also testified that he did not ask Fimbres to keep the records.

On September 29, 1990, Fimbres picked up ice water and paychecks from the GC facilities and went to the fields where he worked. At the end of the shift and after the other workers had left, Fimbres parked his truck, with the portable toilets trailer attached, on the side of the road while he completed the crew time summary. He then crossed the road to have the GTI machine operator sign the form. As he was crossing back to his truck, Fimbres was hit by a vehicle and suffered a traumatic amputation of his leg and serious pelvic and hip injuries. Fimbres testified that if he had not been injured, he would have returned to his truck to complete the daily time record sheet and would have taken the forms to the GC office and the toilet trailer to the GC shop.

Fimbres filed a workers' compensation claim against GC. After GC denied the claim on the ground that GTI was his statutory employer, Fimbres filed a claim against GTI. The claims were consolidated for hearing. The ALJ found that GC was Fimbres's employer and denied his claim against GTI.

## LENT EMPLOYEE DOCTRINE

■ GC first contends that Fimbres was a lent employee of GTI at the time of his injury. In *Word v. Motorola, Inc.*, 135 Ariz. 517, 662 P.2d 1024 (1983), our supreme court approved the following list of factors to be considered in determining when a lent employee has become the employee of a special employer so that the special employer is liable for workers' compensation benefits:

'(a) the employee has made a contract of hire, express or implied, with the special employer;

'(b) the work being done is essentially that of the special employer; and

'(c) the special employer has the right to control the details of the work.'

*Id.* at 520, 662 P.2d at 1027, quoting 1C A. Larson, *The Law of Workmen's Compensation* § 48.00 (1982). There is a presumption that the employment with the general employer continues; all three factors must be met in order to overcome that presumption and find that a special employer-employee relationship was established. *Id.* If all three factors are met as to both employers, then both are liable for workers' compensation benefits. *Id.*

The ALJ concluded that the lent employee doctrine did not apply to GTI because there was no express or implied contract of hire between Fimbres and GTI, because it had not been established that the work Fimbres was doing at the time of his accident was "essentially" GTI's work, and because GTI had no control over the details of that work.

GC argues that an implicit employment contract was entered into because Fimbres accepted GTI's work assignments and supervision, noting that employers who obtain workers from a labor contractor are generally held to be special employers. *Lindsey v. Bucyrus–Erie*, 161 Ariz. 457, 778 P.2d 1353 (App.1989). GC also argues that Fimbres was performing GTI's essential work by working as a laborer in a field helping transplant cauliflower.

Those arguments, however, ignore the fact that at the time he was injured, Fimbres was not transplanting cauliflower but was involved in preparing paperwork used by GC to compute its payroll. It was undisputed that the other laborers had left the field at least fifteen minutes before Fimbres's accident because the work for that day had been completed. As this court pointed out in *Lindsey, supra*, the determinative question as to the second factor is " 'whose work was being done at

the time of the accident?'" 161 Ariz. at 459, 778 P.2d at 1355, quoting *Wuertz v. Howard,* 77 N.M. 228, 230–31, 421 P.2d 441, 442 (1966).

 The ALJ found credible the statements by Fimbres that GC's president had told him to perform the payroll-reporting tasks and that GC's supervisor had told him to haul the toilets and water. The determination as to the credibility of witnesses is solely within the discretion of the ALJ. *Phelps v. Industrial Commission,* 155 Ariz. 501, 747 P.2d 1200 (1987). Thus, in this case, the answer to the question posed in *Lindsey* is GC. Therefore, the ALJ correctly determined that the lent employee doctrine does not apply.

## JOINT OR DUAL EMPLOYMENT

██ GC next argues that Fimbres was at least a joint or dual employee of both GC and GTI although it did not raise the issue until its request for review. The concepts are defined as follows:

> Joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other. In such a case, both employers are liable for workmen's compensation.
>
> Dual employment occurs when a single employee, under contract with two employers, and under the separate control of each, performs services for the most part for each employer separately, and when the service for each employer is largely unrelated to that for the other. In such a case, the employers may be liable for workmen's compensation separately or jointly, depending on the severability of the employee's activity at the time of injury.

1C A. Larson, *The Law of Workmen's Compensation* § 48.41 at 8–553 (1991). Because the ALJ found that Fimbres had not entered into a contract of hire with GTI and that he was performing work only for GC at the time of his accident, there could not be joint employment in this case.

GC has cited two cases in support of its contention that this is a dual employment case. In *Butler v. Industrial Commission,* 50 Ariz. 516, 73 P.2d 703 (1937), the worker was struck by a vehicle while traveling between his two jobs, for which he was on call at all times. Both employers were held liable for his injuries. In *Pinson v. Industrial Commission,* 79 Ariz. 21, 281 P.2d 962 (1955), the court ruled that a produce company was liable for the death of its employee who was killed while traveling between Tucson and Winkelman even though he was also carrying ice for his own business at the time. The court found that his activities at the time of his death were "inextricably entwined" so the two employments could not be separated. *Id.* at 27, 281 P.2d at 966. That is not the case here. Fimbres was clearly performing only GC's work at the time of his injury. We find no error in the ALJ's conclusion that neither joint nor dual employment applies.

## STATUTORY EMPLOYEE

Next, GC argues that Fimbres was a statutory employee of GTI. A statutory employment relationship is predicated on the following language in A.R.S. § 23–902(B):

> When an employer procures work to be done for him by a contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer, then such contractors and the persons employed by him, and his subcontractor and persons employed by the subcontractor, are, within the meaning of this section, employees of the original employer.

Accordingly, the two necessary elements of a statutory employment relationship are: 1) the employer procuring the work must retain supervision or control over the employee's work, and 2) the work "entrusted to the subcontractor must be a '*part or process in the trade or business*' of the employer." *Young v. Environmental Air Products,* 136 Ariz. 158, 164, 665 P.2d 40, 46 (1983) (emphasis in original).

■ In determining whether a statutory employment relationship exists, the courts apply the same "right to control" test that applies in determining whether a person is an employee or an independent contractor. *Hunt Building Corp. v. Industrial Commission*, 148 Ariz. 102, 713 P.2d 303 (1986). The right to control test requires that the courts examine the following factors:

> the duration of the employment; the method of payment; who furnishes necessary equipment; the right to hire and fire; who bears responsibility for workmen's compensation insurance; the extent to which the employer may exercise control over the details of the work[;] and whether the work was performed in the usual and regular course of the employer's business.

*Home Insurance Co. v. Industrial Commission*, 123 Ariz. 348, 350, 599 P.2d 801, 803 (1979).

■ Here, the ALJ analyzed the case by applying those factors, finding that Fimbres had no contact with GTI before it contracted with GC; GC paid his wages; GTI furnished the equipment for the job, but GC workers did not operate it; GC was the only entity who could hire workers; although GTI did ask GC's foreman to leave the job, the decision was not a "firing" but a decision on the number and type of people necessary for the job; GTI machine operators were to contact GC's supervisor if they had problems with the workers; GC carried workers' compensation insurance for its employees; and Fimbres's injury occurred while he was performing duties for GC rather than transplanting duties for GTI.

The ALJ also analyzed the facts pursuant to the applicable test for determining whether the work is a "part or process" of the remote employer's business: "whether the activity in which it is engaged is part of the 'usual trade, business, profession or occupation of an employer.'" *Young*, 136 Ariz. at 164, 665 P.2d at 46, quoting A.R.S. § 23–902(A). The ALJ found that GTI "did not ordinarily and customarily" have the transplanting performed by GTI employees but made arrangements with labor contractors to supply workers on a temporary basis and that the preparation of GC's payroll records was not a part or process of GTI's business.

The evidence in the record is sufficient to support those findings, and those findings are sufficient for the ALJ's conclusions that GC had the right to control the method by which Fimbres performed his payroll-keeping duties and that at the time of his accident, he was engaged in the "usual and regular course" of GC's business rather than GTI's.

### SUFFICIENCY OF FINDINGS

Finally, GC contends that the ALJ's findings are incomplete. We disagree. The findings are sufficient for purposes of appellate review. *Post v. Industrial Commission*, 160 Ariz. 4, 770 P.2d 308 (1989).

The award is affirmed.

HATHAWAY and DRUKE, JJ., concur.